**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
SAVANNAH OXENHIRT,

                         Plaintiff,

      -against-

IN FLIGHT, INC, JOHN GAMBINO, *individually and in his professional capacity*, MARISA RICCI, *individually and in her professional capacity*, TERESA STIVALA, *individually and in her professional capacity*,

                         Defendant.
------------------------------------------------------------------------X

**Civil Action No.:** 7:26-cv-2939

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff, Savannah Oxenhirt (hereinafter "Ms. Oxenhirt" or "Plaintiff"), by and through her undersigned counsel Filippatos PLLC, as and for her Verified Complaint in this action against Defendants, In Flight, Inc. (hereinafter "In Flight"), John Gambino (hereinafter "Mr. Gambino"), Marisa Ricci ("Ms. Ricci") (together hereinafter referred to as "Defendants"), hereby alleges upon information and belief as follows:

## NATURE OF THE CLAIMS

1.    Plaintiff, Savannah Oxenhirt, a dedicated direct support professional, and former Team Lead for Defendant In Flight, was shockingly retaliated against and terminated by Defendants after she engaged in protected activity by reporting serious workplace concerns to her supervisors and to the Justice Center for the Protection of People with Special Needs (the "Justice Center") including but not limited to instances of workplace harassment and mistreatment of Defendant In Flight's clients which Plaintiff witnessed and experienced firsthand.

2.    As a result of Defendants' unlawful conduct, Ms. Oxenhirt brings this action seeking injunctive, declaratory, and monetary relief against Defendants for violating her rights under the New York Labor Law §§ 740 and 741 (the "NYLL").

1

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) as Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000.00.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district, and Defendant is registered in and does business in Dutchess County in the State of New York.

## PARTIES

5.      Plaintiff, Savannah Oxenhirt, is a resident of the State of Florida.

6.      Plaintiff was a Team Lead at In Flight, Inc. and worked there from April 24, 2024, until her unlawful termination on February 3, 2025.

7.      At all relevant times, Ms. Oxenhirt qualified as an "employee" under all relevant statutes.

8.      Upon information and belief, at all times hereinafter mentioned, Defendant, In Flight, Inc., was and still is a domestic not-for-profit corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located at 87 E. Market Street, Red Hook, New York 12571 in Dutchess County.

9.      Upon information and belief, Defendant In Flight operates residential services programs for adults with disabilities in Columbia and Ulster Counties in the State of New York including but not limited to running group homes for adults with disabilities.[1] In Flight operates these residential services programs and group homes with the stated goal of allowing "adults with

---

[1] https://inflightinc.org/residential-program-services/ (Last Visited, April 6, 2026).

intellectual and developmental disabilities to be as independent as possible."[2]  Group homes are run to "support [] residents in pursuing their own quality of life," and creating a space where "they learn household skills in an environment with roommates and 24/7 support."[3]  In Flight also provides programming for "Supporting Apartments" where "a[n] individual lives independently while receiving less direct support as they gain more independence."[4]

10.    Upon information and belief, at all times hereinafter mentioned, Defendant In Flight is a not-for-profit corporation that employed approximately 250+ individuals on a full-time or full-time equivalent basis, and thus is subject to all statutes upon which Plaintiff is proceeding herein.

11.    At all relevant times, Defendant In Flight controlled the terms and conditions of Plaintiff's employment and met the definition of an "employer" and/or a "covered employer", and "employed" Ms. Oxenhirt under all relevant statutes.

12.    Upon information and belief, at all times relevant hereto, Defendant John Gambino was and is an individual residing in the State of New York, as well as an employee of In Flight, holding the position of Vice President of Program and Compliance, and as such had supervisory power, control and authority over Plaintiff's employment and the terms and conditions thereof. Mr. Gambino meets the definition of "employer" under all relevant statutes.

13.    Upon information and belief, at all times relevant hereto, Defendant Marisa Ricci was and is an individual residing in the State of New York, as well as an employee of In Flight, holding the position of Associate Director of Human Resources, and as such had supervisory

---

[2] https://inflightinc.org/residential-program-services/ (Last Visited, April 6, 2026).
[3] https://inflightinc.org/residential-program-services/ (Last Visited, April 6, 2026).
[4] https://inflightinc.org/residential-program-services/ (Last Visited, April 6, 2026).

3

power, control and authority over Plaintiff's employment and the terms and conditions thereof. Ms. Ricci meets the definition of "employer" under all relevant statutes.

14.    Upon information and belief, at all times relevant hereto, Defendant Teresa Stivala was and is an individual residing in the State of New York, as well as an employee of In Flight, holding the position of Vice President of Human Resources, and as such had supervisory power, control and authority over Plaintiff's employment and the terms and conditions thereof. Ms. Stivala meets the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

### I.    Plaintiff is Hired by In Flight, Inc. and is Quickly Promoted Multiple Times

15.    On or about April 24, 2024, Plaintiff began her employment as a Team Lead with In Flight and was assigned to the Taghkanic IRA Residential Group Home ("Taghkanic Residence") run by Defendants.

16.    Under the Management of Kejana Jackson, Ms. Oxenhirt demonstrated consistent dedication, skill, and commitment to her position, earning trust and recognition by her supervisors.

17.    In and around May 2024, Mr. Jackson's employment was terminated by In Flight.

18.    As a result of Mr. Jackson's termination, on or about June 12, 2024, Ms. Oxenhirt was approached by Teresa Stivala, Vice President of Human Resources, and John Gambino, Vice President of Program and Compliance, and asked to take on the role of interim House Manager at the Taghkanic Residence.

19.    Upon information and belief, Ms. Oxenhirt was offered this promotion into the role of interim House Manager because of the positive changes she had implemented and productive contributions she had made to In Flight during her first two months of employment.

20.     In this role, Ms. Oxenhirt's responsibilities were substantially expanded, and she was entrusted with oversight of resident allowances, grocery budgeting, staff scheduling, and day-to-day financial and operational management for Taghkanic Residence's seven (7) male residents.

21.     Ms. Oxenhirt stepped into her new role with pride after being recognized by senior leadership as a reliable and capable leader and she welcomed the opportunity to ensure stability and continuity of care at the Residence during the transition.

22.     Around the same time, in and around June 2024, Defendants hired another employee, Donnaya Hanner-Tibbs, as a Team Lead at the Taghkanic Residence.

23.     In and around the first week of August 2024, Ms. Oxenhirt was approached by one of the maintenance workers at the Taghkanic Residence, Richard Miller. Mr. Miller informed Ms. Oxenhirt that he smelled smoke and had found what he referred to as a "butt," presumably from a cigarette or a marijuana cigarette, in a glove, which he had already thrown out.

24.     In response to this information, Ms. Oxenhirt reminded all staff of the policy regarding smoking.

25.     However, since Ms. Oxenhirt did not witness anyone actually smoking marijuana on the premises, she did not escalate the matter further.

26.     Approximately one week later, on August 10, 2024, Ms. Oxenhirt reported to work at the Taghkanic Residence, on a day that she was not scheduled to work, after being called in to assist due to ongoing staff shortages that were commonplace at the Taghkanic Residence.

27.     During the August 10, 2024 shift, Ms. Oxenhirt witnessed Ms. Hanner-Tibbs violating Defendants' dress code by wearing inappropriate attire, including pink short shorts, pink slippers and a black crop-top t-shirt, which exposed her midriff.

5

28.    After Shann Sangter, a visiting Team Lead, politely and professionally asked Ms. Hanner-Tibbs to comply with Defendants' written dress code policies, Ms. Hanner-Tibbs became disruptive and started screaming and cursing at staff.

29.    Ms. Hanner-Tibbs was asked by the visiting supervisor to clock out and go home, which only made her more irate.

30.    All of this culminated in Ms. Hanner-Tibbs leaving the Residence and immediately retaliating by lodging multiple allegations – totaling fourteen (14) complaints – against various members of the Taghkanic Residence staff with the New York State Justice Center.

31.    It later came to light that this retaliation included Ms. Hanner-Tibbs lodging seven (7) complaints against Ms. Oxenhirt for allegedly failing to report a reportable incident and four (4) complaints against Ms. Oxenhirt for alleged neglect against/to a service recipient.

32.    Later in August 2024, approximately one week after this incident with Ms. Hanner-Tibbs, and after Defendants became aware of the various complaints filed by Ms. Hanner-Tibbs, Ms. Oxenhirt was again approached by Defendants to discuss an increase in her responsibilities, as a result of Ms. Oxenhirt's positive contributions to the Taghkanic Residence and positive performance reviews.

33.    During this meeting in August 2024, John Gambino, In Flight's head of Quality Assurance at the time and the Vice President of Program and Compliance, Teresa Stivala, and Marissa Ricci, Associate Director of Human Resources, asked Ms. Oxenhirt if she would transition from only working at the Taghkanic Residence to working at both the Michael Court Residence and the Nathan Lane Residence.

34.    During this meeting in August 2024, Ms. Oxenhirt also informed Mr. Gambino, Ms. Stivala, and Ms. Ricci that while she had not witnessed it firsthand, she had recently reminded

the staff at the Taghkanic Residence of the policy regarding smoking after Mr. Miller, the maintenance worker, had informed Ms. Oxenhirt that he found a "butt," presumably from a cigarette or marijuana cigarette, in a glove, which he had thrown out.

35.    During this meeting in August 2024, Ms. Oxenhirt, Mr. Gambino, Ms. Stivala and Ms. Ricci also discussed the fact that the smell of marijuana had been detected recently at the Taghkanic Residence.

36.    Ms. Oxenhirt explained that she felt there was no way to tell where that smell was coming from – marijuana could have been used off the premises and not on work time, it could have been from a vehicle a person exited, or a third party altogether – it is very hard to judge *when* the smoking might have occurred.

37.    In this discussion, Mr. Gambino agreed that Ms. Oxenhirt did not have enough evidence to take action, by sending someone home for example, because there was no way to tell if marijuana was being used on the premises.

38.    Ms. Oxenhirt had never seen anyone smoke marijuana in or anywhere near the Residence, and Ms. Oxenhirt never heard any staff member say they smoke marijuana *while on the premises*.

39.    While Ms. Oxenhirt had already reminded the Taghkanic Residence staff of the policy regarding smoking, she also knew it was important to share her concern with Mr. Gambino, Ms. Stivala and Ms. Ricci.

40.    In response, Mr. Gambino, Ms. Stivala, and Ms. Ricci assured Ms. Oxenhirt that they would look into this information and that everything would be fine.

41.    However, nothing ever came of this reporting by Ms. Oxenhirt to In Flight.

42.     Notably, pursuant to In Flight's Employee Handbook, if an employee is named in an allegation to In Flight or the Justice Center, Defendants will attempt, if necessary, to provide a safety measure that either moves the accused employee during the investigation and/or provides line of sight supervision to ensure that the accused employee is not alone with any people receiving support. If a necessary safety measure cannot be guaranteed, the accused employee is placed on administrative leave without pay, pending the investigation by Defendants or the Justice Center.

43.     Notably here, no safety measures were put in place with regard to the allegations against Ms. Oxenhirt and she was never placed on administrative leave pending any investigation, undermining any claim that the allegations against Ms. Oxenhirt were cause for termination. Additionally, while Ms. Oxenhirt was moved to a different location, it was not because of the pending investigation, but rather an increase in her responsibilities, as a result of Ms. Oxenhirt's positive contributions to the Taghkanic Residence and positive performance reviews.

## II.     Ms. Oxenhirt is Subjected to a Sham Investigation

44.     In the wake of Ms. Hanner-Tibbs' retaliatory allegations, Quality Assurance Personnel from In Flight, Meaghan Dressel and Victoria Montalto, claimed to be initiating an internal investigation.

45.     Ms. Oxenhirt fully cooperated in this investigation, responding promptly to all inquiries and providing detailed written and verbal statements as requested by In Flight management.

46.     Despite Ms. Oxenhirt's transparency, cooperation, and consistent professionalism, Defendants refused to furnish Ms. Oxenhirt a copy of her own statement.

47.    This refusal was not only troubling but emblematic of Defendants' broader lack of procedural fairness, raising serious concerns about the integrity and intent of the investigative process.

48.    In and around the end of August 2024, while both the Justice Center's investigation and In Flight's internal investigation were still pending, Ms. Oxenhirt was promoted yet again to the role of Residential Coordinator by Mr. Gambino and Ms. Stivala.

49.    In this elevated position, Ms. Oxenhirt was tasked with overseeing the day-to-day operation of both the Michael Court Residence and the Nathan Lane Residence, as was discussed in mid-August 2024 – an acknowledgement by senior leadership of Ms. Oxenhirt's reliability, competence, and dedication.

50.    This promotion also made clear that Defendants had no legitimate concerns about Ms. Oxenhirt's conduct or integrity, despite the accusations that Ms. Hanner-Tibbs made against her.

51.    Nevertheless, the Justice Center investigation lingered in the background, with Defendants providing little to no transparency regarding the scope, status, or outcome of the allegations against Ms. Oxenhirt.

52.    Defendants' lack of transparency as to its investigation left Ms. Oxenhirt in a state of constant uncertainty despite her demonstrated loyalty and diligent performance and despite Defendants' recognition of Ms. Oxenhirt's capabilities by promoting her to Residential Coordinator.

53.    On September 3, 2024, Ms. Oxenhirt was called into a meeting at the Michael Court Residence by Victoria Montalto, a member of In Flight's Quality Assurance team.

9

54.    During the September 3, 2024 meeting, Ms. Montalto directed Ms. Oxenhirt to prepare a detailed seven-page written statement regarding the ongoing Justice Center investigation into staff conduct at the Taghkanic Residence.

55.    During the September 3, 2024 meeting, Ms. Montalto also asked Ms. Oxenhirt whether she had given residents medication, as needed, at the Taghkanic Residence, which Ms. Oxenhirt confirmed.

56.    Ms. Oxenhirt again complied in good faith, providing a thorough and honest response to all of Ms. Montalto's questions.

57.    Ms. Montalto again assured Ms. Oxenhirt that everything was okay, following the completion of Ms. Oxenhirt's statement and answers to Ms. Montalto's questions.

58.    When Ms. Oxenhirt requested a copy of her own written statement for her records, her request was again summarily denied – further reinforcing the lack of transparency surrounding In Flight's investigative process.

59.    Shortly after the September 3, 2024 meeting, Ms. Oxenhirt ran into Ms. Dressel at the Taghkanic Residence while attending a House Meeting at which Ms. Oxenhirt was asked to assist.

60.    While at the Taghkanic Residence, Ms. Oxenhirt asked Ms. Dressel if the Justice Center's investigation would affect her job.

61.    In response, Ms. Dressel informed Ms. Oxenhirt that if Defendant considered any of the allegations to be an issue, they would have already done something about it.  But Ms. Dressel confirmed that Defendants were not concerned with any of the allegations at that time.

10

62. Despite Ms. Oxenhirt's continued cooperation and strong performance in her newly elevated role, Defendants' communications regarding the ongoing investigation remained opaque and inconsistent.

63. Ms. Oxenhirt's repeated attempts to obtain updates or clarity regarding the investigation were met with evasive responses, vague assurances, or outright silence – leaving Ms. Oxenhirt to navigate a highly sensitive situation without any meaningful support or guidance from Defendants.

64. On or about October 1, 2024, Ms. Oxenhirt requested to step back to a Team Lead role at the Falls Road Residence effective October 6, 2024.

65. During this meeting with Mr. Gambino and Ms. Stivala, Ms. Oxenhirt explained that she felt she had no choice but to step down from her position as Residential Coordinator and return to a Team Lead role because she felt she lacked adequate support from her supervisors in the Residential Coordinator position.

66. For example, as a Residential Coordinator, Ms. Oxenhirt was frequently scheduled to work five consecutive shifts, which was untenable.

67. Ms. Oxenhirt also explained that she did not feel that she had received the necessary training to succeed in the role of Residential Coordinator.

68. Ms. Oxenhirt's October 1, 2024 request was granted and she returned to the position of Team Lead, this time at the Falls Road Residence.

69. During her tenure at the Falls Road Residence, Ms. Oxenhirt continued to fulfill her duties diligently, going above and beyond by facilitating holiday family visits, managing staffing shortfalls, and ensuring client wellbeing was prioritized despite management's repeated and documented neglect.

70.    On October 29, 2024, Ms. Oxenhirt received a call from Oriol Calvin, an Investigator with the Justice Center.

71.    To her surprise, Mr. Calvin confronted Ms. Oxenhirt with allegations entirely unrelated to what she had previously been led to believe was under investigation – namely, claims that staff members at the Taghkanic Residence had been smoking and drinking on site.

72.    The nature of Mr. Calvin's inquiry blindsided Ms. Oxenhirt, who had neither engaged in, nor witnessed, any such conduct.

73.    Ms. Oxenhirt made clear to Mr. Calvin that she had never engaged in, nor even witnessed, any smoking or drinking at the Taghkanic Residence.

74.    Additionally, Ms. Oxenhirt explained to Mr. Calvin that she was not even aware that they were investigating allegations of smoking and drinking on site.

75.    Nevertheless, Ms. Oxenhirt explained that in mid-August 2024, she did report to Mr. Gambino, Ms. Stivala, and Ms. Ricci that she had reminded the Taghkanic Residence staff of the policy regarding smoking, after the maintenance worker, Mr. Miller, advised her that he had found what he described as a "butt," presumably a cigarette butt, on the premises, which he had disposed of.

76.    Ms. Oxenhirt communicated to Mr. Calvin clearly and truthfully that she had not engaged in, or witnessed any smoking on the premises, and that the only information she had received was the fact that the maintenance worker found a "butt" on the ground, which she reported to Defendants.

77.    Rather than acknowledging her candor and professionalism, Mr. Calvin responded with hostility, treating Ms. Oxenhirt in a condescending and accusatory manner that was both

inappropriate and deeply distressing, especially since throughout her employment, Ms. Oxenhirt meticulously fulfilled her obligations as a mandated reporter.

78. On the other hand, In Flight's management consistently failed to maintain ethical and professional standards, and instead Ms. Oxenhirt faced increasingly undue scrutiny and negative repercussions, which were unwarranted.

### III. Ms. Oxenhirt is Subjected to Harassment, Intimidation, and Sudden Reassignment After Reporting Misconduct Which She Witnessed Firsthand

79. Once she began working at the Falls Road Residence as a Team Lead, Ms. Oxenhirt began to notice issues with staff involving unprofessionalism and neglect.

80. For example, on many occasions, Ms. Oxenhirt dealt with staff calling out of work or not showing up at work at all without warning.

81. Ms. Oxenhirt reported all of these staff call-outs and no-shows to Ronda Broadhead, Associate Director of Residential Services for In Flight.

82. In another example, on November 28, 2024 – Thanksgiving Day – while working at the Falls Road Residence under the supervision of Juran Anderson, Ms. Oxenhirt was subjected to physically intimidating conduct by Mr. Anderson.

83. On November 28, 2024, Mr. Anderson was scheduled to arrive at 12:00 p.m., but failed to report to work until approximately 5:00 p.m.

84. Mr. Anderson's failure to report to work on time required Ms. Oxenhirt to manage the Residence entirely on her own for approximately five (5) hours.

85. Despite Mr. Anderson's failure to report to work, Ms. Oxenhirt went above and beyond her required duties: she picked up a resident's parent on her way into work to ensure a holiday visit could occur, prepared the house for festivities, and ensured the five (5) residents of Falls Road were properly supported.

86. When Mr. Anderson finally arrived many hours late, Ms. Oxenhirt informed him that she would be leaving the Residence to bring the resident's parent home.

87. In response, Mr. Anderson threatened Ms. Oxenhirt and told her that she could not leave work, despite the fact that she had been covering for him single-handedly for many hours.

88. When Ms. Oxenhirt attempted to clock out, Mr. Anderson *physically blocked her from doing so* – **twice** – by placing his body and arm between her and the time clock.

89. Ultimately, Ms. Oxenhirt left the Residence without clocking out and promptly texted Mr. Anderson's direct supervisor, Ms. Broadhead, to document Mr. Anderson's inappropriate behavior and make a record of the time she departed.

90. In another instance, immediately following Thanksgiving 2024, Ms. Oxenhirt's purchasing privileges for the Falls Road House were revoked by Mr. Anderson, in a clear act of retaliation for Ms. Oxenhirt's protected complaint to Ms. Broadhead regarding Mr. Anderson's unlawful conduct.

91. As a result, Mr. Anderson was the only staff member who could purchase groceries for the Falls Road Residence.

92. Shockingly, soon thereafter, Ms. Oxenhirt arrived at the Falls Road Residence and found that there was no food in the house.

93. Ms. Oxenhirt reported this neglect to Ms. Broadhead as well, and she explained that it had been caused by Mr. Anderson's misconduct.

94. Unfortunately, these were not isolated incidents, but rather they were part of a broader pattern of retaliation against Ms. Oxenhirt by Mr. Anderson, which went unchecked by Defendant's senior leadership.

14

95.     Mr. Anderson subjected Ms. Oxenhirt to this retaliation and harassment from November 2024 to January 2025.

96.     By way of example, Mr. Anderson routinely directed inappropriate and demeaning remarks at Ms. Oxenhirt in the presence of staff and residents, including but not limited to criticizing her car, and her appearance, age, attire, and professional abilities.

97.     Mr. Anderson made repeated inappropriate comments such as, "You haven't been performing your best this week," and "I know you don't have car problems – your car is new" when Ms. Oxenhirt was delayed due to car trouble.

98.     It was clear that Mr. Anderson's actions were conducted with the purpose of belittling Ms. Oxenhirt and undermining her authority.

99.     Mr. Anderson's comments were part of a broader pattern of retaliation and harassment that Ms. Oxenhirt repeatedly reported to Ms. Broadhead, to no avail.

100.    Despite Ms. Oxenhirt's efforts to document Mr. Anderson's behavior, none of her reports were ever acknowledged or acted upon and Defendants did nothing to prevent this misconduct from continuing.

101.    Defendants' silence in the face of these serious complaints not only enabled Mr. Anderson's misconduct – it reinforced a culture of complicity, hostility, and retaliation that left Ms. Oxenhirt isolated, unsupported, and at risk.

102.    While Ms. Oxenhirt's protected complaints were ignored, in or around December 2024, Ms. Oxenhirt received a formal verbal warning from Ms. Broadhead accusing Ms. Oxenhirt of leaving work early.

103.    In fact, Ms. Oxenhirt was not originally scheduled to work on the day in question but came in voluntarily to try to help her co-workers from being overwhelmed.

104. Before agreeing to take this extra shift, however, Ms. Oxenhirt made it clear that she would need to leave by 4:00 p.m.

105. Despite her record of exemplary performance and responsible conduct, Ms. Oxenhirt was abruptly notified that she would be transferred to a different residence, in a further act of retaliation.

106. According to Defendants, Ms. Oxenhirt's abrupt transfer was allegedly due to a "conflict of interest."

107. However, when Ms. Oxenhirt reached out to Ms. Broadhead to ask what the conflict was, she was not given a reason.

108. On or about January 10, 2025, Ms. Oxenhirt requested per diem employment status, to enable her to work on a shift-by-shift basis rather than full-time.

109. Ms. Oxenhirt made this request in light of the harassment and retaliation she continued to face from Defendants, which was causing her increasingly significant emotional distress.

110. During the week of January 13, 2025, Ms. Oxenhirt was told by Ms. Stivala that she was being transferred to the Riozzi Court Residence ("Riozzi Court").

111. Although Ms. Stivala framed the transition as a positive development, Ms. Oxenhirt then had a conversation on or around January 13, 2025, with Eric Reynolds, the Manager of Riozzi Court, who advised her against transferring there.

112. Mr. Reynolds described the residents at Riozzi Court as highly aggressive – hitting each other with canes, punching light fixtures, and refusing to take their medication.

113.    Based on this conversation, Ms. Oxenhirt believed that a transfer to Riozzi Court would place her in an unsafe environment and that she had not received the training necessary to manage such challenging conditions.

**IV.    Defendants Respond to Ms. Oxenhirt's Mandated Report of Misconduct with Swift and Unlawful Retaliation**

114.    On or about January 12, 2025, Ms. Oxenhirt reported to work at the Falls Road Residence as the night shift employees were leaving.

115.    Ms. Oxenhirt inquired about the whereabouts of a blind resident, David R., and a night shift employee, Barb V., told Ms. Oxenhirt that she had placed the resident in his room with the door closed because he was "annoying" her and the employee stated she "couldn't take it anymore."

116.    Ms. Oxenhirt was immediately alarmed, as this response indicated a serious violation of the resident's rights and raised concerns of potential abuse and neglect under state and city law.

117.    Upon entering David R.'s room, Ms. Oxenhirt found that the resident had been confined for approximately two (2) hours.

118.    When Ms. Oxenhirt inquired further, staff on duty responded dismissively, again stating that the resident had simply been "annoying."

119.    The use of isolation as punishment, especially against a blind resident, was not only deeply troubling and entirely inappropriate, but illegal.

120.    The resident, David R., informed Ms. Oxenhirt that he was hungry and thirsty, further underscoring the neglect he had experienced.

121.    Recognizing the seriousness of this incident and her obligations as a mandated reporter, Ms. Oxenhirt took immediate action.

17

122.    Ms. Oxenhirt documented the incident, notified In Flight's in-house Quality Assurance department, and submitted a formal report to the Justice Center on January 15, 2025, further reaffirming her understanding of, and commitment to, her responsibilities as a mandated reporter.

123.    Ms. Oxenhirt also included in her report to the Justice Center descriptions of the previous retaliation and harassment she faced from Mr. Anderson at the Falls Road Residence, and the neglect she witnessed when Mr. Anderson failed to purchase any food for the Falls Road residents.

124.    The very next day, on January 16, 2025, Ms. Oxenhirt received a call from Meaghan Dressel, a member of In Flight's Quality Assurance team, requesting that Ms. Oxenhirt report to In Flight's Red Hook facility's conference room to document the events she had witnessed at the Falls Road Residence.

125.    Ms. Oxenhirt immediately agreed, understanding the seriousness of the incident.

126.    Ms. Oxenhirt spent approximately four (4) hours at In Flight's Red Hook office carefully detailing the incident in a written statement pursuant to Defendants' request.

127.    During that meeting, Ms. Oxenhirt confided in Ms. Dressel that she feared she would face termination for making this report.

128.    Rather than acknowledge this concern or take any steps to safeguard Ms. Oxenhirt from further retaliation, Ms. Dressel simply offered a vague assurance that she would "protect her."

129.    Ms. Dressel's promise, like so many others given to Ms. Oxenhirt during her time at In Flight, would soon prove to be hollow.

130.    After completing her statement, Ms. Oxenhirt requested a copy for her own records.

131.   In response, Ms. Dressel once again denied Ms. Oxenhirt's request—this time citing HIPAA as the reason, despite the fact that the report was written by Ms. Oxenhirt herself and did not contain confidential medical information belonging to any resident.

132.   Ms. Dressel's refusal to provide Ms. Oxenhirt a copy of her own statement further deepened Ms. Oxenhirt's concerns that Defendant was once again attempting to suppress evidence, control the narrative, and isolate Ms. Oxenhirt from documentation that might later protect her.

133.   On January 28, 2025, Ms. Oxenhirt received a letter from the Justice Center stating that of the fourteen (14) allegations made against her by Ms. Hanner-Tibbs, seven (7) of them had been substantiated.

134.   The seven (7) allegations which were found to be substantiated were all for Obstruction. None of the allegations of neglect were found to be substantiated.

135.   According to the Justice Center's January 28, 2025 letter, their initial investigation revealed that Ms. Oxenhirt failed to report a reportable incident that occurred between August 18, 2024 and September 14, 2024.

136.   However, the "incident," which allegedly occurred between August 18, 2024 and September 14, 2024, was in fact reported by Ms. Oxenhirt to Defendants in mid-August, 2024.

137.   In mid-August 2024 and again in December 2024, Ms. Oxenhirt met with In Flight's Human Resources and Quality Assurance personnel, John Gambino, Marisa Ricci, and Teresa Stivala, to share her perspective regarding the concern that staff may have been smoking marijuana at the Taghkanic Residence. Ms. Oxenhirt reported directly to Mr. Gambino, Ms. Ricci, and Ms. Stivala that the maintenance worker had found a "butt" on the premises, and that any "odor" of marijuana was not enough to take action because there was no way to tell *when* marijuana use may have occurred based on odor alone.

138.    As such, Ms. Oxenhirt clearly and timely reported the information she had received.

139.    Additionally, the mid-August 2024 and December 2024 meetings ended with Mr. Gambino assuring Ms. Oxenhirt that the matter would be investigated by Defendant and ***there was nothing further Ms. Oxenhirt was required to do***.

140.    However, Ms. Oxenhirt later learned that despite her reports to Defendants, no documentation was ever created and no corrective measures were taken by Defendants in response to the information Ms. Oxenhirt provided.

141.    Predictably – and shamefully – Defendants then acted on Ms. Oxenhirt's well-founded fears of retaliation.

142.    On February 3, 2025, just two and a half weeks after she reported the unlawful confinement of a resident of the Falls Road Residence to the Justice Center, Ms. Oxenhirt received a call from Ms. Stivala, in which she informed Ms. Oxenhirt that she was being terminated for an alleged "failure to report" nearly six (6) months earlier at the Taghkanic Residence.

143.    Notably, the termination of Ms. Oxenhirt's employment runs in direct contravention of In Flight's Employee Handbook, which addresses the appropriate disciplinary measures to be taken when an investigation is completed resulting in substantiated or unsubstantiated allegations.

144.    According to Defendant's Employee Handbook, if an investigation reveals substantiated allegations they may (1) rise to the level of termination ***or*** (2) require re-training and/or immediate transfer. As such, Ms. Oxenhirt's termination was not required simply because the Justice Center had initial substantiated a complaint against her.

145.    On February 20, 2025, Ms. Oxenhirt appealed the initial determination of the Justice Center.

146.    On December 1, 2025, the Justice Center issued a determination as to Ms. Oxenhirt's appeal, dismissing all but one allegation against her.

147.    Additionally, recent background checks have revealed no discrepancies on Ms. Oxenhirt's record, which indicates that the accusations lodged against Ms. Oxenhirt were not so severe that termination was warranted.

148.    However, this did not prevent Defendants from using the baseless accusations against Ms. Oxenhirt as pretext to terminate her employment only after she reported clear and unmistakable misconduct by In Flight's staff and high-ranking officials.

149.    Defendants' justification for terminating Ms. Oxenhirt is simply implausible: Not only had Ms. Oxenhirt been promoted to Residential Coordinator during the pendency of the investigation in question, she had also actively cooperated at every step, and had never received any disciplinary notice or indication of wrongdoing.

150.    Additionally, included in the Justice Center's formal report were "areas of systemic concern," which included the fact that In Flight's "Staff are not familiar with the mandated reporter policy and when an incident needs to be reported" and that "*while it could not substantiate*[,] there is a concern of ongoing marijuana use by the staff at the Residence which violates [] agency substance abuse policy while on the premises." (emphasis added).

151.    At this time, the only remaining allegation against Ms. Oxenhirt is one for Obstruction and is labeled a Category 3 allegation, according to the Justice Center's ranking of allegations on a scale of 1 to 4, with 1 being the most egregious and 4 being the least egregious.[5]

---

[5] https://www.justicecenter.ny.gov/system/files/documents/2021/10/what-to-expect-if-you-are-involved-in-a-jc-investigation-october-2021.pdf (Last Visited, April 6, 2026).

21

152.    According to the Guidance for Staff and Volunteers issued by the Justice Center, after an incident is reported they are first categorized as "Non-Reportable" or "Reportable."[6]

153.    Non-reportable incidents include general inquiries and incidents that do not fall under the jurisdiction of the Justice Center.

154.    Reportable incidents are categorized as "abuse or neglect" or a "significant incident".[7]

155.    Further, once the Justice Center concludes an investigation, it issues a final determination about whether each individual allegation is substantiated and, if substantiated, the category level.

156.    The Justice Center's category levels fall on a scale of 1-4 with Category 1 being the most severe, Category 2 involving allegations that "significantly endanger[] the health, safety, or welfare of a service recipient", Category 3 involving "less serious incidents of abuse or neglect," and Category 4 which indicate "Conditions at a program or facility expose people receiving services to harm or risk of harm."[8]

157.    These categories correspond directly to the disciplinary measures outlined in Defendants' Employee Handbook for substantiated allegations and indicate that Categories 1 and 2 rise to the level of termination, while Categories 3 and 4 do "not rise to the level of termination and require[] re-training and/or immediate transfer."

---

[6] https://www.justicecenter.ny.gov/system/files/documents/2021/10/what-to-expect-if-you-are-involved-in-a-jc-investigation-october-2021.pdf (Last Visited, April 6, 2026).
[7] https://www.justicecenter.ny.gov/system/files/documents/2021/10/what-to-expect-if-you-are-involved-in-a-jc-investigation-october-2021.pdf (Last Visited, April 6, 2026).
[8] https://www.justicecenter.ny.gov/system/files/documents/2021/10/what-to-expect-if-you-are-involved-in-a-jc-investigation-october-2021.pdf (Last Visited, April 6, 2026).

158.    Moreover, the Justice Center's January 28, 2025 determination letter noted that only seven (7) of the fourteen (14) allegations against Plaintiff were substantiated and all of them were labeled a Category 3, "less serious incidents of abuse or neglect".

159.    Following Ms. Oxenhirt's February 20, 2025 appeal of the Justice Center's determination, six (6) of the seven (7) allegations which were substantiated were dismissed, and the only remaining substantiated allegation against Ms. Oxenhirt is one Category 3 allegation for failing to report a reportable incident to the Vulnerable Persons Central Register.

160.    As explained, in mid-August 2024 and again in December 2024, Ms. Oxenhirt reported her perspective of the alleged incident to In Flight's Human Resources and Quality Assurance Personnel and Ms. Oxenhirt was assured by Defendants that there was nothing further she was required to do.

161.    Additionally, not only did Defendants fail to report the incident which Ms. Oxenhirt put them on notice of as early as mid-August 2024, but the single remaining Category 3 allegation against Ms. Oxenhirt does not rise to the level requiring termination.

162.    As such, Defendants' decision to terminate Ms. Oxenhirt's employment was entirely pretextual and in retaliation for Ms. Oxenhirt's January 15, 2025 report of unlawful abuse and neglect.

163.    This is especially true in light of Ms. Oxenhirt's successful appeal of the seven (7) substantiated allegations against her and the Justice Center's determination that only one Category 3 allegation for obstruction remains against her – for failure to report a reportable incident, which Ms. Oxenhirt reported to Defendants in mid-August 2024.

164.    Additionally, the Justice Center's original January 22, 2025 report found that staff are not familiar with the mandated reporter policy, further demonstrating Defendants' own failure

to properly train its staff and underscoring one of the potential reasons Ms. Oxenhirt's August 2024 and December 2024 reports to Defendants were not properly routed to the Justice Center through no fault of Ms. Oxenhirt's.

165.     It was only after Ms. Oxenhirt fulfilled her legal obligation as a mandated reporter in January 2025 to report abuse and neglect of In Flight's residents that her employment was terminated—in a clear act of retaliation.

166.     Defendant's decision to rely on baseless and unproven allegations from the past – only *after* Ms. Oxenhirt exercised her rights and obligations under the law – is a textbook example of unlawful retaliation.

167.     Ms. Oxenhirt's termination occurred mere days after her Justice Center report.

168.     Ms. Oxenhirt's termination also followed an unmistakable pattern: threats, stonewalling, denial of documentation, and then a sudden and baseless termination.

### FIRST CAUSE OF ACTION
**(Retaliation in Violation of New York Labor Law § 740)**

169.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

170.     New York Labor Law ("NYLL") § 740 prohibits covered employers from retaliating against an employee who "discloses or threatens to disclose to a supervisor or to a public body any activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety." *See* NYLL § 740(2)(a).

171.     Plaintiff is an "employee" within the meaning of NYLL § 740(1)(a).

172.     Defendant is an "employer" within the meaning of NYLL § 740(1)(b).

173.    As alleged herein, Plaintiff engaged in conduct protected from retaliatory actions within the meaning of the statute.

174.    As alleged herein, Defendant retaliated against Plaintiff for her participation in a protected activity by terminating Plaintiff's employment.

175.    Accordingly, as a result of Defendant's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under the law.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of New York Labor Law § 741)**

176.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs of the Complaint as if fully set forth herein.

177.    New York Labor Law ("NYLL") § 741 prohibits covered employers from retaliating against an "employee who discloses or threatens to disclose to a supervisor, to a public body… an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety." *See*, NYLL § 741(2)(a).

178.    Plaintiff is an "employee" within the meaning of NYLL § 741(1)(a).

179.    Defendant is an "employer" within the meaning of NYLL § 741(1)(b).

180.    As alleged herein, Plaintiff engaged in conduct protected from retaliatory actions within the meaning of the statute.

181.    As alleged herein, Defendants retaliated against Plaintiff for her participation in a protected activity by terminating Plaintiff's employment.

182. Accordingly, as a result of Defendant's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under the law.

## JURY DEMAND

183. Plaintiff, Savannah Oxenhirt, demands a trial by jury as to all issues triable by jury in the above-entitled civil action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that Defendant engaged in unlawful employment practices prohibited by New York Labor Law §§ 740 and 741.

B. Awarding damages to Plaintiff or all lost wages and benefits resulting from Defendant's unlawful conduct and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful conduct;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D. Awarding Plaintiff all other remedies available in law and equity, including punitive damages;

E. Awarding Plaintiff attorneys' fees and costs as allowed by law; and

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendant's unlawful employment practices.

Dated:  New York, New York
         April 9, 2026

                                                    **FILIPPATOS PLLC**


                                         By: _____
                                         Erica T. Healey-Kagan, Esq.
                                         Daniel J. Chavez, Esq.
                                         *Attorneys for Plaintiff*
                                         425 Madison Avenue, Suite 1502
                                         New York, New York 10017
                                         Tel: (914) 984-1111
                                         ehealeykagan@filippatoslaw.com
                                         dchavez@filippatoslaw.com

27